UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BERLY VALLADARES, | ) | |
| | ) | |
| Petitioner, | ) | 17 C 1000 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| MICHAEL MELVIN, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

### MEMORANDUM OPINION AND ORDER

Berly Valladares, an Illinois prisoner serving a seventy-year sentence for first degree murder and aggravated battery with a firearm, petitions for a writ of habeas corpus under 28 U.S.C. § 2254. Doc. 1. After the Warden moved to dismiss the petition for failure to exhaust, Doc. 6, Valladares voluntarily dismissed the unexhausted claims, Doc. 14 at 3; Doc. 15. As for the remaining claims, Valladares first alleges that his trial attorneys were ineffective under the Sixth Amendment in three respects: (a) they did not adequately meet with and prepare him for trial; (b) they did not move to suppress statements he made to police; and (c) they did not move to exclude evidence regarding his gang membership. Doc. 1 at 26-56. Second, Valladares claims that the state trial court violated his Sixth and Fourteenth Amendment rights by making certain statements during voir dire and by denying his motion for a nonpattern jury instruction concerning the law of accountability. *Id*. at 56-62. Third, Valladares claims that there was insufficient evidence to support his murder conviction. *Id*. at 62-63. The habeas petition is denied, and a certificate of appealability will not issue.

## Background

A federal habeas court presumes that the state court's factual findings are correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Jean-Paul v. Douma*, 809 F.3d 354, 360 (7th Cir. 2015) ("A state court's factual finding is unreasonable only if it ignores the clear and convincing weight of the evidence.") (internal quotation marks omitted). The Appellate Court of Illinois was the last state court to address the merits of the claims that Valladares presses on federal habeas review, and also the last to have fully set forth the pertinent facts and procedural history. *People v. Valladares*, 2016 WL 6140005 (Ill. App. Oct. 18, 2016); *People v. Valladares*, 994 N.E.2d 938 (Ill. App. 2013). The following sets forth the facts as the appellate court described them and as the trial court transcripts reflect, as well as the procedural background of the state criminal and post-conviction proceedings.

### A.    Factual Background

Francisco Valencia was killed and Daisy Camacho seriously injured when Narcisco Gatica—apparently upset at having been denied entry to a 2009 Halloween party—shot into the crowd at the house where the party was being held. 994 N.E.2d at 942. Valladares—who, like Gatica, was a member of the Maniac Latin Disciples ("MLD")—had given Gatica the gun. *Id*. at 924, 944. Valladares served as the "gun holder for the gang," meaning that his role was to provide members with weapons and ammunition upon request. *Id*. at 945. As Valladares testified at trial, gang members would "violate[]" or "discipline[]" him if he refused such requests. *Id*. at 945, 950; Doc. 18-6 at 45. Valladares testified that he did not know what Gatica would do with the gun when he handed it over. 994 N.E.2d at 946; Doc. 18-6 at 47-48.

Chicago police detective Michael Landando was assigned to investigate the shooting. 994 N.E.2d at 943. As the state appellate court recounted, Landando "concentrated [his]

investigation on the members of the [MLD] gang because there were two factions of the gang in that area of [Chicago]." *Ibid*.; Doc. 18-5 at 141. Landando spoke with several MLD members, one of whom stated that he "saw Valladares and Gatica walking" toward the house where the party was held and "then heard gunshots a few minutes later." 994 N.E.2d at 943-44. In addition, Valladares was captured on surveillance footage from cameras at the front and back of the house. *Id*. at 946. And according to an FBI special agent, Valladares's and Gatica's "phones were consistently co-located in close proximity to each other and the crime scene," and the pair exchanged eight calls between 12:45 a.m. and 1:46 a.m.—a period that encompassed the shooting, which occurred minutes after 1:00 a.m. *Id*. at 943.

On the morning of November 3, 2009, two days after the shooting, Landando and Detective John Valkner "interview[ed] Valladares at his place of work." *Id*. at 944. Valladares testified that he was "cooperative" with police. *Id*. at 946; Doc. 18-6 at 46. Landando testified that, "prior to talking to [Valladares, he] advised [Valladares] of his *Miranda* warnings because at that point [the investigators] weren't sure what [Valladares's] knowledge or his involvement was in the homicide, so [they] just gave him his *Miranda* [warnings] as a precautionary measure." Doc. 18-5 at 146. Valladares acknowledged the *Miranda* warning, agreed to speak with the detectives, and drove with Landando to the local police headquarters. 994 N.E.2d at 944; Doc. 18-5 at 146. While in the car, Valladares admitted to being an MLD gang member and stated that another gang member, "Mickey," requested a weapon the night of the shooting. 994 N.E.2d at 944; Doc. 18-5 at 147. Valladares added that the detectives "would probably find [Valladares's] fingerprints on the gun." 994 N.E.2d at 944; Doc. 18-5 at 148. Landando testified: "At that point, [Valladares] became a suspect in the investigation, and he was now

under arrest. … [My] partner and I did not question him any further until we arrived" at the station. Doc. 18-5 at 148; 994 N.E.2d at 944.

Landando further testified that, upon arriving at the station, the detectives "activated the audio and videotape equipment," as required by Illinois law, 725 ILCS 5/103-2.1, when officers conduct a murder investigation. Doc. 18-5 at 148; 994 N.E.2d at 944. The detectives issued a second set of *Miranda* warnings to Valladares, which he indicated that he "understood," before restarting the interview. 994 N.E.2d at 944; Doc. 18-5 at 161. During the interview, Valladares "admitted that he gave the gun to Gatica," loaded with six to eight bullets. 994 N.E.2d at 944-45; Doc. 18-6 at 47-49, 71-73. Valladares testified at trial that he did not know what Gatica would do with the gun, though he assumed that Gatica was worried about a "gang dispute." 994 N.E.2d at 945-46; Doc. 18-6 at 47-48, 51-52, 72. Valladares added that his statements to the detectives "pretty much explain[ed] what happened" that night. Doc. 18-6 at 46.

### B.      Verdict and New Trial Motion

The jury convicted Valladares of first degree murder on an accountability theory, *see* 720 ILCS 5/9-1, and aggravated battery with a firearm, *see* 720 ILCS 5/12-3.05. 944 N.E.2d at 942. Represented by new counsel, Valladares moved for a new trial on the ground that his trial attorneys, David Wiener and Jack Wilk, provided ineffective assistance. (Wiener's surname is spelled two ways in the record. *Compare*, *e.g.*, Doc. 18-12 at 64 ("Wiener"), *and* Doc. 18-5 at 2, 118 ("Wiener"), *with*, *e.g.*, Doc. 18-6 at 2 ("Weiner"). Although the appellate court used "Weiner," 994 N.E.2d at 946, the trial record suggests that "Wiener" is the correct spelling.) Specifically, Valladares contended that "trial counsel failed to meet with him, did not file a motion to suppress his statements to the police, and agreed to the prejudicial admission of gang evidence." *Id*. at 942. Valladares also contended that the state trial court erred in conducting

voir dire and in instructing the jury, and that the evidence was insufficient to support the convictions. *Ibid*.

Wiener and Wilk testified at the hearing on the new trial motion, along with Valladares and his mother. *Id.* at 946-48. Wiener and Wilk testified that they were "experienced" criminal attorneys, *id.* at 948: Wiener practiced primarily criminal law since 1969, Doc. 18-7 at 58, and Wilk practiced criminal law for twenty-one years, fourteen as a prosecutor and seven as a defense attorney, *id.* at 176. While admitting that he never visited Valladares in pretrial detention, Wiener explained that Wilk, his co-counsel and an attorney at his firm, did so twice—on January 21, 2010, before the prosecution's production of discovery, and again on September 20, 2010, three days before trial. 994 N.E.2d at 946, 950; Doc. 18-7 at 61-63. Wiener added that he met with Valladares "in the lockup" behind the courtroom on each court date. 994 N.E.2d at 946; Doc. 18-7 at 65, 115-116. At one such meeting, Wiener reviewed with Valladares the transcript of his recorded statement to police, though not "the videotaped recording" itself. 994 N.E.2d at 946; Doc. 18-7 at 64-65. Moreover, Wiener testified that Valladares called him collect on several occasions and that they spoke about the case during those calls. 994 N.E.2d at 946-47; Doc. 18-7 at 66; *see also* 994 N.E.2d at 951 (noting that Wiener and Wilk understood based on their pretrial conversations with Valladares that he wanted to testify at trial).

As to Valladares's initial statement to police—made in the car before arriving at the station—Wiener testified that he did not move to suppress it, or to quash Valladares's arrest, because "Valladares voluntarily spoke with the detectives in their car and Valladares's statements were not part of a custodial situation." 994 N.E.2d at 947; Doc. 18-7 at 80. Although Valladares testified at the hearing that "he was arrested before entering the car," the appellate

court held that this testimony "was undermined by his trial testimony" that he had gotten in the car voluntarily. 994 N.E.2d at 953.

Wiener then explained why he believed that Valladares's videotaped statement—the one made at the station—"should be admitted at trial to corroborate the defense theory." *Id*. at 947. Wiener believed that the statement "would be helpful in convincing the jury" that Valladares lacked the specific intent required to prove that he had committed first degree murder on an accountability theory. *Ibid*.; Doc. 18-7 at 85. According to Wiener: "Mr. Valladares convinced me that merely by holding the gun and then passing it on, that he had no idea[] that the shooter in this case had been at a party, [and] was going to use the gun in any offense." Doc. 18-7 at 78. Wiener added that he feared that "even if [the] statement was suppressed, it could be used in rebuttal." 994 N.E.2d at 947; Doc. 18-7 at 79, 83. Wiener was also concerned that a "number of witnesses [could] indicat[e] that Mr. Valladares handed the gun to the shooter, walked with the shooter, and a group of other people to the location … within the hour or the half hour before the shooting did occur." Doc. 18-7 at 89. And Wiener believed that the consistency of Valladares's accounts of the events would make him more credible in the eyes of the jury. 994 N.E.2d at 947. Although Wilk's notes indicated that the detectives told Valladares at the station that "he could go home if he gave it up," Wiener testified that he "understood Valladares's statement to be voluntary under the circumstances." *Ibid*.

As for the evidence of gang membership, Wiener testified that he believed "the only way to explain … in context" Valladares's admission that he had given the gun to Gatica was to "allow[]" the "entire video" of his statement "to be played to the jury," including the portion regarding gang membership. Doc. 18-7 at 85. It is for this reason that Wiener did not oppose admission of gang affiliation evidence, although he did object to the prosecution's calling a

"gang expert." 994 N.E.2d at 947. The appellate court noted, moreover, that Wiener "asked the court to inquire during voir dire whether the jurors could be fair despite gang evidence." *Ibid*.

Wiener did not, however, seek an instruction regarding the defense of compulsion or necessity. *Id*. at 954, 956. Wiener explained that "based on the viewing of the video and listening to the audio and ta[l]king to Mr. Valladares[,] … there was [no] reason to … believe that compulsion or necessity were an issue at any time in this case. I just reviewed the evidence and talked to Mr. Valladares and found that those were not the defenses that would give rise to instructions based on those defenses, and I did not ask for them." Doc. 18-7 at 87.

Wilk testified that he first met with Valladares on January 21, 2010. *Id*. at 177. Wilk did not have the benefit of discovery at that time. 994 N.E.2d at 950. Wilk next met with Valladares three days before trial, on September 20, 2010. *Ibid*.; Doc. 18-7 at 170. During that meeting, which lasted "in excess of a[n] hour," Wilk first discussed with Valladares "whether or not he wished to testify." Doc. 18-7 at 170-171. After discussing Valladares's right not to testify, the rest of the meeting was spent reviewing "the transcript of [the] video statement." *Id*. at 172. Wilk prepared Valladares for his trial testimony by "[giving] him some questions [Wilk] would start off with" and letting him know that Wilk would "kind of lead him through the events that occurred." *Ibid*.; 994 N.E.2d at 951. Before testifying, Valladares affirmed in a colloquy with the trial court that the decision about whether to testify was his "alone"; that he had "an absolute right not to testify [o]n his own behalf"; that he had an opportunity to "discuss this decision [to testify] with [his] attorneys"; that he did not "need any additional time to discuss" his decision with his attorneys; and that he wished to testify. Doc. 18-7 at 140-142; 994 N.E.2d at 951.

### C. Direct Appeal

The trial court denied Valladares's new trial motion, and the appellate court affirmed. 994 N.E.2d at 948, 961. Applying *Strickland v. Washington*, 466 U.S. 668 (1984), the appellate court explained that, "[t]o prove ineffective assistance of counsel, the defendant must allege facts showing counsel's representation as both objectively unreasonable and counsel's deficiency prejudiced him." 994 N.E.2d at 949.

The appellate court first considered whether Wiener "performed deficiently by proceeding to trial without meeting with and preparing Valladares to testify, and [whether] this caused prejudice to his case." *Id.* at 949. It concluded that "[t]he record shows there was sufficient communication between the defense team and Valladares," and thus that *Strickland*'s first prong has not been met. *Id.* at 951. In support, the court observed that Wiener "spoke with Valladares several times throughout the proceedings by telephone and in the courtroom lock-up," and that "Wilk met with Valladares twice at the jail." *Id.* at 950-51. The court also noted that Wiener and Wilk each discussed with Valladares his decision to testify, and that Wilk and Valladares "went over the transcript of Valladares's [recorded] statement and all of the police reports before trial." *Id.* at 951. The court added that, in any event, Valladares could not satisfy *Strickland*'s second prong because he "neglect[ed] to indicate what … insight" he might have gained through additional pretrial meetings or "how additional communication would have altered the outcome of the case." *Ibid*. The court noted in this regard that, during the post-trial hearing, "Valladares admitted that even with a different attorney and more time to prepare, he would have left intact his testimony concerning Gatica's intent, a crucial element of the defense theory." *Ibid*.

The appellate court next considered whether Wiener provided ineffective assistance by failing to move to suppress Valladares's statements to police. *Ibid*. Addressing *Strickland*'s first prong, the court noted that Wiener testified that, "as a matter of strategy, the defense team chose to allow the admission of Valladares's statements to the police because they served to bolster the defense theory" in several ways: (1) they explained why Valladares gave Gatica the gun, and thus showed that he lacked the intent "to aid or abet Gatica in the commission of the crime as required by the accountability statute"; (2) they showed that Valladares's accounts of the events leading up to the shooting had been consistent; and (3) they reflected that he had been cooperative with police. *Id*. at 952-53. The court also noted Wiener's reasonable belief that the prosecution had other witnesses available who could testify to seeing "Valladares hand the gun to Gatica and accompany him to the house" where the shooting occurred. *Id*. at 953. Given that "[d]efense counsel considered Valladares's explanation for his actions compelling evidence necessary to defeat the State's case," the court held that Valladares had "failed to overcome the strong presumption that trial counsel's decision not to file a motion to suppress was the result of sound trial strategy." *Ibid*.

As to *Strickland*'s second prong, the appellate court held that a motion to suppress or to quash arrest would likely have been unsuccessful. Focusing on "Valladares's unrecorded statement given in the police car," the court explained that the evidence at trial reflected that he voluntarily spoke with Landando and Valkner and voluntarily accompanied them to the station. *Ibid*. Despite Valladares's contrary testimony at the post-trial hearing, the court reasoned that the trial evidence "support[ed] a conclusion that his statements to the police were voluntary." *Ibid*. Accordingly, the court held "that had counsel filed the motion [to suppress the statement in the car], it would [not] have been successful." *Ibid*. The court likewise concluded that the

videotaped statement at the station was voluntary, as Valladares "admitted at trial that he spoke with the police because he believed his fingerprints were on the gun." *Ibid.*

The appellate court next addressed whether Wiener provided ineffective assistance by failing to object to the admission of evidence concerning Valladares's membership in the MLD gang. *Ibid.* The court acknowledged that gang evidence can significantly prejudice a jury. *Id.* at 954. The court held, however, that "[d]efense counsel's decision to use the gang evidence to try to explain Valladares's actions as nonaccountable"—that is, to explain why he lacked the mental state necessary to be convicted under an accountability theory—"was a reasonable and legitimate trial strategy, even though it turned out to be unsuccessful." *Id.* at 957. "Through the gang evidence, the defense sought to explain Valladares's actions and establish that Valladares was required to provide a gun to any gang member that requested one, without discretion, and with no regard for the reason behind the request." *Id.* at 956. As a result, the court held "that trial counsel presented a plausible, consistent defense and acted as an advocate on Valladares's behalf throughout the proceedings," and thus that Valladares "could not meet his burden under either prong of *Strickland*." *Id.* at 956-57.

The appellate court next held that Wiener did not provide ineffective assistance in failing to request a jury instruction concerning compulsion or necessity. *Ibid.* As the court explained, those defenses are available under Illinois law only if there is evidence of "an *imminent* threat of harm or danger to [the] defendant," and Valladares's trial testimony that he would be "severely beaten" at some later, unspecified point did not provide evidence sufficient to satisfy the imminence standard. *Id.* at 956 (emphasis added).

Finally, the appellate court addressed whether: (1) "the trial court erred by pre-instructing the jury during voir dire concerning the law of accountability" in violation of Illinois Supreme

Court Rule 431(a), which provides that the trial court's questioning of potential jurors "shall not directly or indirectly concern matters of law or instructions," Ill. S. Ct. R. 431(a); (2) the trial court misstated the law of accountability in its final instructions by denying Valladares's request to instruct the jury using a "non-Illinois Pattern Jury Instruction" as to the mental state necessary to "find a defendant guilty based on an accountability theory"; and (3) there was insufficient evidence to establish *corpus delicti*. 994 N.E.2d at 957-61; 2016 WL 6140005, at *2.

Before voir dire, the trial judge said this to prospective jurors regarding Illinois accountability law: "[A]t the end of this case, the court may instruct you at the close of evidence that a person who plans, aids, or agrees to aid others in the commission of a crime is legally responsible for any crime in furtherance of that plan by any of those other persons." 994 N.E.2d at 957. The court then asked: "Would you follow the law if it is given to you in this case? Is there anybody here who could not follow that law?" *Ibid*. Rejecting Valladares's argument that this was error, the appellate court explained, citing *People v. Klimawicze*, 815 N.E.2d 760 (Ill. App. 2004), that the trial court was permitted to give "potential jurors … a brief summary of accountability principles and then inquire whether the jurors can follow the law and apply those principles." 994 N.E.2d at 957. The court then held that the trial judge's voir dire was "not meaningfully distinct" from the voir dire upheld in *Klimawicze* and *People v. Davis*, 447 N.E.2d 353 (Ill. 1983), and that, in any event, any error was "harmless" because the trial court "informed [the jury] on three separate occasions … that a conviction based on accountability required the defendant to intend the crimes and knowingly aid and abet." 994 N.E.2d at 958.

The appellate court also ruled that the trial judge properly instructed the jury at the end of the case regarding the law of accountability, explaining that he used "pattern instruction on accountability" and "on the presumption of innocence, the State's burden, and the elements of

the crimes." *Id*. at 959. Applying Illinois Supreme Court Rule 451(a), which states that the Illinois Pattern Jury Instructions, if available and accurate, "shall be used" in criminal cases, the court held that the judge "had no reason to dispense with the pattern instruction on accountability in favor of the defense-requested nonpattern instruction": "[T]he instructions the trial court provided in this case accurately expressed to the jury the correct principles of law and as such, the trial court did not abuse its discretion by rejecting defense counsel's proffered nonpattern instruction." *Ibid*.; *see also* 2016 WL 6140005, at *2 ("[T]here was no reason for the trial court to give something other than the legally-accurate pattern instruction on accountability.").

The appellate court then rejected Valladares's contention that the "State failed to offer sufficient evidence, independent of his confession, to establish *corpus delicti*"—that is, to meet its "burden to prove beyond a reasonable doubt that a crime occurred." 994 N.E.2d at 959. Distinguishing *People v. Rivera*, 962 N.E.2d 53 (Ill. App. 2011), and *People v. Sargent*, 940 N.E.2d 1045 (Ill. 2010), the court explained that numerous "eyewitness accounts of the shooting established the *corpus delicti* of the charged crimes, *i.e.*, that Valencia was killed and Camacho was injured in a criminal manner." *Id*. at 961. The court added that a doctor testified that Valencia's cause of death was homicide and that he "died from multiple gunshot wounds." *Ibid*. And, the court explained, "Valladares testified at trial that he arrived at the shooting with Gatica and is depicted in the surveillance video the jury viewed." *Ibid*. The court therefore held that, "[v]iewing the evidence in the light most favorable to the State, … any rational trier of fact could have found Valladares liable under the accountability theory of first degree murder and aggravated battery with a firearm beyond a reasonable doubt." *Ibid*.; *see also* 2016 WL 6140005, at *2 ("As to *corpus delicti*, we found the evidence sufficient to convict Valladares on

an accountability basis, finding his statements were corroborated by his trial testimony, gang affiliation, and the telephone and video evidence.").

Valladares filed a counseled petition for leave to appeal ("PLA"), which the Supreme Court of Illinois denied. *People v. Valladares*, 2 N.E.3d 1050 (Ill. 2013).

### D.    State Post-Conviction Proceedings

After his PLA was denied, Valladares filed a *pro se* post-conviction petition under 725 ILCS 5/122-1. Doc. 18-8 at 49-109. As the post-conviction trial court summarized, Valladares's petition raised several grounds, including:

> (1) his arrest was not supported by probable cause; (2) his indictment was procured through false testimony; (3) the State committed prosecutorial misconduct by introducing evidence of gang activity during trial; (4) the trial court failed to advise the jury of the circumstances of his arrest; (5) the trial court failed to answer a jury question; (6) the pervasive media coverage of his case violated his right to a fair trial; and (7) his trial counsel was ineffective.

Doc. 18-8 at 143. As to the ineffective assistance claims, Valladares contended that Wiener "was ineffective for failing to: (1) interview witnesses at [Valladares's] place of employment; (2) obtain video surveillance from his employer; and (3) request a gag order and a change of venue in light of the prejudicial media coverage." *Id*. at 161. Those ineffective assistance claims do not overlap with the claims that Valladares presses on federal habeas review.

The trial court denied the petition, holding that Valladares's claims were barred because they "either were[] or could have been raised on direct appeal," and that they were "frivolous and patently without merit" in any event. *Id*. at 151, 167. The appellate court affirmed, 2016 WL 6140005, at *1, and the state supreme court denied review, *People v. Valladares*, 77 N.E.3d 85 (Ill. 2017).

At the time he filed this federal habeas petition on February 6, 2017, Valladares had several appeals pending in state court, raising issues distinct from those he now advances on

federal habeas.  Doc. 17 at 4-5; *see also* Doc. 18-9 at 267-276 (state court denying Valladares's petition for relief from judgment under 735 ILCS 5/2-1401); Doc. 18-11 (summarizing Valladares's full procedural history in state court and detailing, through February 2017, his later efforts to move for leave to file successive state post-conviction petitions).  Valladares dropped the unexhausted claims, Doc. 14 at 3, which were dismissed, Doc. 15.

## Discussion

Valladares's federal habeas claims are considered in turn.

## I. Ineffective Assistance Claims

Valladares claims that his trial attorneys were ineffective under the Sixth Amendment in that: (a) they did not adequately meet with and prepare him for trial; (b) they did not move to suppress statements he made to police; and (c) they did not move to exclude evidence regarding his gang membership.  Doc. 1 at 26-56.  Because the state appellate court addressed those claims on the merits, Valladares's habeas challenge is governed by 28 U.S.C. § 2254(d).  *See Laux v. Zatecky*, 890 F.3d 666, 673 (7th Cir. 2018).  "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of th[e] [Supreme] Court, § 2254(d)(1); or that it 'involved an unreasonable application of' such law, § 2254(d)(1); or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)."  *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (citation omitted); *see also Snow v. Pfister*, 880 F.3d 857, 863-64 (7th Cir. 2018) (same).

Valladares argues that the appellate court unreasonably applied *Strickland* in rejecting his ineffective assistance claims.  "[A] state court decision involves an 'unreasonable application of' federal law if the state court 'correctly identifies the governing legal principle … but

14

unreasonably applies it to the facts of the particular case.'" *Kamlager v. Pollard*, 715 F.3d 1010, 1015-16 (7th Cir. 2013) (second alteration in original) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). To obtain relief under § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (internal quotation marks omitted). "'[T]he lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since a general standard from [the Supreme Court's] cases can supply such law.'" *Gilbert v. McCulloch*, 776 F.3d 487, 491 (7th Cir. 2015) (alteration in original) (quoting *Marshall v. Rodgers*, 569 U.S. 58, 62 (2013)). But "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents." *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (internal quotation marks omitted); *see also Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc) ("[F]ederal habeas relief from state convictions is rare. It is reserved for those relatively uncommon cases in which state courts veer well outside the channels of reasonable decision-making about federal constitutional claims.").

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel. *See Vinyard v. United States*, 804 F.3d 1218, 1224 (7th Cir. 2015). A defendant claiming ineffective assistance under *Strickland* must show that both that (1) his attorney's performance was deficient and (2) he suffered prejudice as a result. *See Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015). As to deficient performance, a defendant must show that counsel's performance "'fell below an objective standard of reasonableness.'" *Blackmon v.*

*Williams*, 823 F.3d 1088, 1102-03 (7th Cir. 2016) (quoting *Strickland*, 466 U.S. at 688). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (internal quotation marks omitted). "A court's scrutiny of an attorney's performance is 'highly deferential' to eliminate as much as possible the distorting effects of hindsight, and [it] 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Vinyard*, 804 F.3d at 1225 (quoting *Strickland*, 466 U.S. at 689); *see also Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.") (internal quotation marks omitted). As to prejudice, a defendant must show "a reasonable probability that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Hinesley v. Knight*, 837 F.3d 721, 732 (7th Cir. 2016) (for *Strickland* prejudice, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome") (internal quotation marks omitted). "When the claim at issue is one for ineffective assistance of counsel, moreover, [federal habeas] review is doubly deferential, … afford[ing] both the state court and the defense attorney the benefit of the doubt." *Woods*, 136 S. Ct. at 1151 (internal quotation marks and citations omitted).

### A. Counsel's Meetings with Valladares and Preparation of Him for Trial

"*Strickland* imposes few requirements on attorneys, but one it specifically enumerates is 'to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.'" *United States v. Holman*, 314 F.3d 837, 841 (7th Cir. 2002) (quoting *Strickland*, 466 U.S. at 688). Valladares contends that Wiener was ineffective because he "never had a single confidential conversation with … Valladares and

never visited" him in pretrial detention. Doc. 1 at 26. Valladares asserts that "[t]he entire universe of attorney-client contact between Attorney Wiener and Mr. Valladares was comprised of short non-confidential conversations which took place during trial while … Valladares was held in the lock-up behind the courtroom." *Id*. at 27.

Before proceeding, it bears mention that there is no rule regarding the number of meetings that an attorney must have with a client to satisfy *Strickland*. *See United States v. Olson*, 846 F.2d 1103, 1108 (7th Cir. 1988) ("[W]e know of no case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance.") (quoting *Kleba v. McGinnis*, 796 F.2d 947, 954 (7th Cir. 1986)). Nor is there a rule regarding the conditions under which such meetings must be held. *See United States v. Goad*, 44 F.3d 580, 590 n.18 (7th Cir. 1995) (noting that "that the amount of time an accused has to consult with his attorney is of itself not an important consideration" under *Strickland*); *Olson*, 846 F.2d at 1108 (considering contact by mail and telephone in assessing the overall reasonableness of the communication between the defendant and trial counsel). More to the point, the state appellate court did not apply *Strickland* unreasonably in holding that counsel's representation of Valladares was not "ineffective" in this respect. 994 N.E.2d at 961.

As the appellate court reasonably and, in fact, correctly explained, the record shows that Wiener and Wilk met with Valladares on several occasions. Wiener "spoke with Valladares several times throughout the proceedings by telephone and in the courtroom lock-up." 994 N.E.2d at 950-51. Wilk, too, met with Valladares twice—the second time for over an hour to prepare for trial "by going over the transcripts of Valladares's videotaped statement and providing Valladares with some questions with which he would start his testimony, informing Valladares how his testimony would proceed, and leading him through the events of the shooting

as they occurred." *Id.* at 951. The situation presented here is thus akin to that in *Olson*, where the Seventh Circuit rejected a *Strickland* claim given the defendant's acknowledgment that he spoke with his lawyer twice in person and once over the telephone, and that the two corresponded by mail as well. 846 F.2d at 1108. Moreover, as experienced criminal attorneys, Wiener and Wilk could be expected to "'get more out of one interview with a client than a neophyte lawyer.'" *Ibid.* (citation omitted). Given this, Valladares cannot show that the appellate court unreasonably applied *Strickland* in holding that "there was sufficient communication between the defense team and Valladares." 994 N.E.2d at 951.

Pressing the opposite result, Valladares contends that trial counsel prepared him poorly for trial. Doc. 1 at 29-32. In support, he notes that his responses at trial to Wilk's questions about what would have happened had he not given the gun to Gatica show that he was "unable to understand the question and articulate an answer," with the correct answer being that he feared being beaten or otherwise harmed if he refused Gatica's request. *Ibid.* Valladares's contention is belied by the appellate court's opinion; it observed that "Valladares acknowledged in open court that he had discussed his decision to testify with his attorneys and that he did not need additional time to confer with them," 994 N.E.2d at 951; Doc. 18-6 at 26, and recognized that "Valladares's defense theory was that he provided the gun to Gatica out of compulsion that he would be severely beaten," 994 N.E.2d at 956. And the transcript shows Valladares testifying that he would "get violated from body head to toe or body only" for failing "to follow orders." Doc. 18-6 at 45. It follows that Valladares's trial testimony in fact conveyed what he now says it should have conveyed, and therefore that the appellate court reasonably applied *Strickland* in holding that counsel's preparation of him for trial was not ineffective.

## B.    Counsel's Failure to Move to Suppress Valladares's Statements to Police

Valladares next contends that Wiener and Wilk were ineffective for failing to move to suppress or otherwise limit the jury's exposure to his statements to police admitting that he gave Gatica the gun used in the shooting. "*Strickland* generally provides a presumption of strategic decision-making by counsel" unless "there was no strategic rationale underlying the errors." *Mitchell v. Enloe*, 817 F.3d 532, 538-39 (7th Cir. 2016) (alterations and internal quotation marks omitted). A federal court's review under § 2254(d) "is therefore doubly deferential, in the sense that *Strickland*'s inquiry is highly deferential to a lawyer's plausible strategic choices, and … review under section 2254(d) is likewise highly deferential to the state courts that resolved [the petitioner's] ineffectiveness claim in the first instance." *Hinesley*, 837 F.3d at 732 (internal quotation marks and citations omitted).

The record provides ample support for the appellate court's conclusion that trial counsel made a series of permissible strategic choices in opting not to move to suppress the statements. As an initial matter, the record justifies Wiener's likely correct belief, 994 N.E.2d at 947, that Valladares's statements to police were voluntary, *id*. at 944, 953. Valladares does not dispute that he agreed to speak with the detectives at his workplace or that they twice gave him *Miranda* warnings, first in the car on the way to the station and again upon arrival. *Id*. at 944; Doc. 1 at 34-35; Doc. 18-5 at 146, 161. As the court held, despite his contradictory testimony at the post-trial hearing, Valladares's "trial testimony supports a conclusion that his statements to the police were voluntary," as he "admitted at trial that he spoke with the police because he believed his fingerprints were on the gun." 994 N.E.2d at 953; Doc. 18-6 at 92-93. And Landando testified that Valladares agreed to "come in and talk" when Landando and Valkner arrived at his workplace two days after the shooting, admitted on the way to the station (after being given

*Miranda* warnings) that his fingerprints were likely on the gun, and continued to speak with police at the station after they activated the recording equipment and gave him *Miranda* warnings a second time. Doc. 18-5 at 141-148, 160-162.

Against this backdrop, the appellate court reasonably held that Wiener's decision not to move to suppress Valladares's statements satisfied *Strickland*'s first prong. 994 N.E.2d at 953. Given Landando's and Valladares's accounts of the events surrounding Valladares's statements, such a motion almost certainly would have failed. *Ibid.*; *see also Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) ("Counsel … is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether.").

Moreover, the appellate court reasonably concluded that Wiener credibly testified that he believed the statements were beneficial to the defense, in that they showed that Valladares did not have "any knowledge at all that the person he handed the gun to was going to use the gun in any situation," that his story had been consistent throughout the investigation and trial, and that he cooperated with the police. Doc. 18-7 at 78-84; 994 N.E.2d at 952-53. Wiener testified that he "wanted to use the videotaped statement as a prior consistent statement supporting Valladares's testimony that he did not know what Gatica planned to do with the gun and that he provided the gun only because he was required to based on his position within the gang." 994 N.E.2d at 952. Wiener added that he feared that other witnesses would have testified that Valladares "handed the gun to the shooter, walked with the shooter, and a group of other people to the location of the shooting … within the hour or the half hour before the shooting did occur." Doc. 18-7 at 89. Given this record, the court reasonably held that "[t]he availability of these witnesses had Valladares's statements been suppressed was an important factor in defense

counsel's strategy … . Had the witnesses testified, the jury would hear evidence about Valladares's actions that night, but would not have heard Valladares's explanations for his actions." 994 N.E.2d at 953.

Given all this, the appellate court reasonably applied *Strickland* in holding that Wiener's decision not to move to suppress the statements was "the result of sound trial strategy." 994 N.E.2d at 953; *see McElvaney v. Pollard*, 735 F.3d 528, 532 (7th Cir. 2013) ("In evaluating an attorney's performance, courts must defer to any strategic decision the lawyer made that falls within the wide range of reasonable professional assistance, even if that strategy was ultimately unsuccessful.") (internal quotation marks omitted); *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013) (same). True, another lawyer in Wiener's position might have pursued a different strategy. But in light of the evidence that Valladares spoke with police voluntarily and the limited prospects for success of a motion to suppress, Wiener's concerns that other witnesses might incriminate Valladares, and Wiener's efforts to contextualize Valladares's statements in the most favorable light possible to exonerate him of the murder charge, the court's ruling is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White*, 136 S. Ct. at 460 (internal quotation marks omitted).

In pressing the opposite result, Valladares contends that the videotaped statement was the only evidence "connecting [him] directly to the crime." Doc. 1 at 35. That is incorrect: Landando testified at trial that at least one witness placed Valladares on the scene, with Gatica, minutes before the shooting, 994 N.E.2d at 943-44, and Valladares was captured on surveillance footage from the front and back of the house, *id*. at 946, 961. Moreover, evaluating the pros and cons of the jury's hearing the videotaped statement is a judgment call committed to counsel and,

on federal habeas review, to the state court applying *Strickland*. As the Seventh Circuit has explained, "[s]trategic decisions like these, so long as they are made after a thorough investigation of law and facts, are 'virtually unchallengeable.'" *Blackmon*, 823 F.3d at 1103 (quoting *Strickland*, 466 U.S. at 690). Wiener's testimony provides ample support for the appellate court's determination that he made a plausible strategic choice in deciding not to seek exclusion of the videotaped statement.

Valladares also contends that the detectives' promise at the station that "he could go home if he gave a statement" rendered the videotaped statement involuntary, and therefore that his attorneys were ineffective in failing to move to suppress it. Doc. 1 at 42 (alleging that Valladares told Wilk about the detectives' promise); *see also id*. at 39-40 (alleging that Valladares's arrest was unlawful). The appellate court considered and rejected this argument, explaining that Valladares's trial testimony made clear that he spoke to the officers voluntarily out of concern that he would be linked to the gun. 994 N.E.2d at 953. Valladares offers no basis to find this an unreasonable application of *Strickland*.

Finally, Valladares contends that Wiener was ineffective in failing to move to suppress his statement in the police car on the ground that the police, in violation of Illinois law, failed to activate recording equipment. Doc. 1 at 36; Doc. 18-1 at 53-54. The appellate court did not address this argument, so this court evaluates it *de novo*. *See Thomas v. Clements*, 789 F.3d 760, 767 (7th Cir. 2015). Illinois law provides that, in a murder investigation, a presumption of inadmissibility applies to an unrecorded statement made "as a result of a custodial interrogation conducted at a police station or other place of detention," 725 ILCS 5/103-2.1(b), but that the presumption "may be overcome by … evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances," 725 ILCS 5/103-2.1(f). *See People v.*

*Mandoline*, 73 N.E.3d 73, 105 (Ill. App. 2017) (holding that the "State overcame the presumption of inadmissibility").  A statement's voluntariness is evaluated in the same manner as under the Constitution, considering "the defendant's age, physical condition, and other factors affecting his ability to understand the proceedings and the consequences of his choice to give a statement; and the circumstances of the detention and interrogation, including their duration, the giving of *Miranda* warnings, and any indications of physical or mental abuse." *People v. Whitfield*, 78 N.E.3d 1015, 1037 (Ill. App. 2017) (citing *People v. Slater*, 886 N.E.2d 986, 1000 (Ill. 2008)).  The statement's reliability, a separate question from voluntariness, comes into question when there is indication that it was "unreliable or false" due to, for example, "mental impediments" or deprivation of "food, water, or sleep." *Id.* at 1037-38.

The appellate court held that Valladares agreed to accompany the officers to the station and voluntarily made the incriminating statement in the car after acknowledging the *Miranda* warnings.  994 N.E.2d at 953.  Additionally, Valladares has not challenged the reliability of this statement, which was corroborated by his later videotaped statement.  *Id.* at 944; *see also Whitfield*, 78 N.E.3d at 1039 (finding the consistency between recorded and unrecorded statements supportive of reliability).  Accordingly, a motion to suppress on the ground that the detectives did not record his statement in the car would have failed.

### C.    Counsel's Failure to Move to Suppress Gang Affiliation Evidence

Valladares next challenges Wiener's failure to move to suppress or limit the admission of evidence concerning his membership in the MLD gang, including "highly prejudicial, irrelevant gang tattoos" and "questions about gang activities."  Doc. 1 at 43-44.  The appellate court rejected the argument, holding that Wiener reasonably sought to use the gang membership evidence to defeat the intent element of the murder charge.  994 N.E.2d at 955-56.  In fact, the

court concluded that Valladares's gang membership was central to his defense—it was necessary to "explain Valladares's actions and establish that [he] was required to provide a gun to any gang member that requested one, without discretion, and with no regard for the reason behind the request." *Id*. at 956. The court's decision did not unreasonably apply *Strickland*, for the record supports its conclusion that Wiener "presented a plausible, consistent defense" on Valladares's behalf, 994 N.E.2d at 956, given that the gang evidence provided the necessary "context" for his decision to give Gatica the gun, Doc. 18-7 at 85. *See Blackmon*, 823 F.3d at 1103 (noting that a state court's decision is entitled to deference, "so long as it is not objectively unreasonable").

Valladares also argues that the appellate court unreasonably applied *Strickland* because Wiener should have requested a limiting instruction that would have minimized prejudice from the gang evidence. Doc. 1 at 48-49. But Valladares does not explain how the evidence, once admitted, could have been limited in a way that would have minimized prejudice; in any event, Wiener could "have chosen not to request a limiting instruction to avoid focusing [the] jury's attention on the unfavorable use that could be made of the evidence." *United States v. Kellum*, 42 F.3d 1087, 1095 (7th Cir. 1994). It follows that Valladares fails to explain how requesting a limiting instruction would have created a "reasonable probability" of a "different [trial] outcome," as he must under *Strickland*'s second prong. *Carter*, 796 F.3d at 737.

Valladares next argues that the appellate court did not account for the fact that Wiener never requested an instruction on the compulsion or necessity defense. Doc. 1 at 45. That is wrong, as the court explained that these defenses could be raised under Illinois law only if Valladares had evidence that he would have been under "*imminent* threat of harm or danger" had he refused Gatica's request for a gun. 994 N.E.2d at 956 (emphasis added). Valladares contends that, due to counsel's ineffective assistance, he failed to explain to the jury that he "would be

punished and beaten if he did not turn over the gun when asked." Doc. 1 at 30. As noted, however, the court acknowledged that Valladares's "defense theory" was that he would have been "severely beaten" had he not given Gatica a gun. 994 N.E.2d at 956. It nevertheless held that the "defense of compulsion" or "necessity" would not have been "available" to him due to the imminence requirement of Illinois law. *Ibid*. Valladares points to nothing in the record indicating that his gang punishment would have been meted out in the immediate aftermath of his refusal to provide the gun to Gatica. *See Faucett v. United States*, 872 F.3d 506, 512 (7th Cir. 2017) (holding that, under *Strickland*, defense counsel "cannot be faulted for failing to explore a futile defense strategy"). He therefore fails to show that the court's decision—that Wiener was not ineffective in failing to request a necessity or compulsion defense—unreasonably applied *Strickland*.

## II.     Voir Dire and Jury Instructions

Valladares next claims that the state trial court violated his Sixth and Fourteenth Amendment rights by: (a) pre-instructing the venire during voir dire as to the law of accountability, even though Illinois Supreme Court Rule 431(a) prohibits courts from questioning potential jurors concerning "matters of law or instructions"; and (b) rejecting his proposed jury instruction that, consistent with *People v. Taylor*, 712 N.E.2d 326 (Ill. 1999), would have informed the jury that to obtain a conviction on an accountability theory, the prosecution had to prove that he specifically intended to aid and abet in the commission of the offense. Doc. 1 at 56-62; *see* 994 N.E.2d at 957-59.

The first component of this claim fails because an argument that the state court "misinterpreted or misapplied state law" is unreviewable under § 2254(d). *Lopez v. Thurmer*, 594 F.3d 584, 587 (7th Cir. 2010); *see also Foreman v. Hardy*, 2011 WL 2746515 (N.D. Ill. Jul

14, 2011) (holding that a claim that the "trial court's instructions to the venire failed to comply with Illinois Supreme Court Rule 431(a)" was not cognizable under federal habeas review). The second component is equally meritless. The appellate court ruled that "[t]he instructions the trial court provided in this case accurately expressed to the jury the correct principles of [accountability] law." 994 N.E.2d at 959 (construing Ill. S. Ct. R. 451(a)). That conclusion, based on the court's assessment of the adequacy of the applicable Illinois Pattern Jury Instructions, may not be disturbed on federal habeas review. *See King v. Pfister*, 834 F.3d 808, 814 (7th Cir. 2016) ("It is well-established that on habeas review, a federal court cannot disagree with a state court's resolution of an issue of state law.")

## III.    Sufficiency of the Evidence

Finally, Valladares claims that "there was inadequate evidence to prove the *corpus delicti* [sic] to the crime." Doc. 1 at 62. "[A] federal court may not [under § 2254(d)] overturn a state court decision rejecting a sufficiency of the evidence challenge" unless "the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quoting *Renico v. Lett*, 559 U.S. 773 (2010)). The appellate court concluded that the record, even putting aside Valladares's videotaped statement, contained "sufficient evidence to establish the crimes of first degree murder and aggravated battery with a firearm beyond a reasonable doubt." 994 N.E.2d at 961. That evidence included eyewitness accounts, expert testimony, surveillance footage, and data from Valladares's and Gatica's phone records. *Ibid*. Given this evidence, together with Valladares's failure to point to anything in the record that would tend to undermine the court's reasoning, the court's holding was not objectively unreasonable.

## Conclusion

Valladares's federal habeas petition is denied. Habeas Rule 11(a) provides that the district court "must issue or deny a certificate of appealability [('COA')] when it enters a final order adverse to the applicant." *See also Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011) (citing 28 U.S.C. § 2253(c)). Where, as here, this court decides a petitioner's claims on the merits, the applicable standard is:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that … includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.

*Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal quotation marks omitted); *see also Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014) (same).

This court's denial of Valladares's habeas claims relies on settled precedents and principles. The application of those precedents and principles to those claims does not present difficult or close questions, and so this case does not meet the applicable standard for granting a certificate of appealability. The court therefore denies a certificate of appealability.

August 27, 2018

_____
United States District Judge